### In re MENTAL ILLNESS OF THOMAS.

[Cite as *In re Mental Illness of Thomas* (1996), 108 Ohio App.3d 697.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 17314.

Decided Jan. 24, 1996.

698

George R. Wertz, for appellant.

Barry M. Ward, for appellee.

REECE, Judge.

Appellant, Linda J. Thomas, appeals from the order of the probate court adopting the referee's report finding her "a mentally ill person subject to hospitalization by court order." We reverse.

I

On February 24, 1995, Andrew Thomas, Linda Thomas's son, filed an affidavit with the probate court alleging that his mother "[r]epresents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior or evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm." Pursuant to R.C. 5122.11, Thomas was detained and admitted to Cuyahoga Falls General Hospital.

On March 3, 1995, a hearing was conducted before a referee at Cuyahoga Falls General Hospital. The referee found, upon clear and convincing evidence, that Thomas was a mentally ill person subject to hospitalization by court order pursuant to R.C. 5122.15. Thomas was ordered into the care of the Alcohol, Drug Addiction and Mental Health Services Board of Summit County ("ADAMHS") for a period not to exceed ninety days. The probate court overruled Thomas's objections to the referee's report and adopted the report as the court's final judgment.

On May 1, 1995, ADAMHS moved the probate court to order termination of Thomas's commitment. The motion was granted May 16, 1995. Thomas timely appeals the probate court's order overruling her objections to the referee's report.

## II

Thomas presents three assignments of error, the first two relating to the sufficiency and weight of the evidence and the third stating that the court failed to order the least restrictive means in treating her condition. We need not address Thomas's third assignment of error as both parties conceded at oral argument that it is moot. Because Thomas's first and second assignments of error both require an examination of the evidence presented to the referee, we will consider them jointly.

In her first assignment of error Thomas argues the probate court erred in determining that there was clear and convincing evidence that she was mentally ill and subject to hospitalization pursuant to R.C. 5122.01. Thomas's second assignment of error states the finding was against the manifest weight of the evidence.

R.C. 5122.01(A) defines "mental illness" as a "substantial disorder of thought, mood perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life." The statute further defines a "[m]entally ill person subject to hospitalization by court order" as a mentally ill person who:

"(1) Represents a substantial risk of physical harm to himself as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;

"(2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;

"(3) Represents a substantial and immediate risk of serious physical impairment or injury to himself as manifested by evidence that he is unable to provide

for and is not providing for his basic physical needs because of his mental illness and that appropriate provision for such needs cannot be made immediately available in the community; or

"(4) Would benefit from treatment in a hospital for his mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or himself." R.C. 5122.01(B).

The evidence supporting a finding that a person is mentally ill and subject to court ordered hospitalization must be clear and convincing. R.C. 5122.15(C). See, also, *In re Burton* (1984), 11 Ohio St.3d 147, 150, 11 OBR 465, 467–468, 464 N.E.2d 530, 534–535.

The Supreme Court of Ohio has defined "clear and convincing evidence" as:

"That measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cincinnati Bar Assn. v. Massengale* (1991), 58 Ohio St.3d 121, 122, 568 N.E.2d 1222, 1223, citing *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus.

"Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54, 60. However, the appellate court must be ever mindful of its responsibility to refrain from substituting its judgment for that of the trial court where there exists competent, credible evidence supporting the lower court's determination. *Id.*

The above standard applies when evaluating whether a judgment in a civil case is against the manifest weight of the evidence. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

Two experts testified at Thomas's hearing, Dr. Ranga Pakeeree and Dr. James Karpawich. Dr. Pakeeree stated he had treated Thomas for anxiety resulting from her ongoing divorce two to three times approximately one and one-half

years prior to the hearing.[1] He treated her again upon her admission to Cuyahoga Falls General Hospital. Pakeeree stated that he believed Thomas was suffering from a circumscribed, paranoid delusional disorder. Most of the facts he testified to in support of this opinion were from the history provided to him by Thomas's husband and son. Pakeeree testified that his recommendation was to keep Thomas in the hospital against her will.

However, on cross-examination Pakeeree admitted that Thomas did not have a substantial disorder of memory, mood, orientation or perception. He also admitted that he had no personal knowledge of her paranoid behavior other than that related to him by Thomas's husband and son. When asked, Pakeeree acknowledged that Thomas was not impaired in her ability to meet the ordinary demands of life and was able to take care of her basic physical needs. Pakeeree also admitted that he had not witnessed any behavior that represents a substantial risk of physical harm to others. His only awareness of any violent behavior on Thomas's part again came from Thomas's husband and son, and that was merely one threat made some six to nine months earlier. Pakeeree conceded the threat would not be characterized as recent. Pakeeree also testified on cross-examination that Thomas had been compliant since her admission to Cuyahoga Falls General Hospital and that she presented no danger to herself.

Concerning the danger Thomas presents, Pakeeree testified as follows on cross-examination:

"Q. Your testimony was that she may be dangerous to the family?

"A. Correct.

"Q. May be dangerous.

"A. Correct.

"Q. She has not presented a danger in the past, based upon your information or knowledge?

"A. Based on my information from the family, there have been threats. There have been threats in the past. I don't when these were, but there were some. I don't know when these occurred. I don't know when, but, you know * * *. That is a concern I have.

" * * * *

"Q. Would she then become an immediate risk of harm and evidence behavior—homicidal or other violent behavior?

---

1. Thomas and her husband are separated and in the process of obtaining a divorce. Mr. Thomas testified on direct examination that the divorce has been pending since October 16, 1993.

"A. This may happen.

" * * *

"Q. And it may not?

"A. Yes.

" * * *

"Q. * * * Right now you have not seen any evidence of homicidal behavior?

"A. No, I haven't.

"Q. Any evidence of violent behavior?

"A. No, I haven't seen that.

"Q. Nor have you seen any threats?

"A. I haven't seen any threats."

Dr. James Karpawich testified that he first met Thomas in October 1994 when he was appointed by the domestic relations court to evaluate her. Karpawich testified that he met with Thomas for four hours on October 28, 1994 and on November 18, 1994. He also made a home visit on November 22, 1994 and met with her again on March 2, 1995 to evaluate Thomas prior to her hearing. Karpawich also met with Thomas's husband, son, daughter, and sister. Karpawich testified that he believed Thomas was suffering from a very circumscribed, delusional disorder wherein she believes her estranged husband is having her followed due to an ongoing divorce proceeding. Karpawich testified that this paranoia is limited to her husband and that she does not believe other people are having her followed, nor does she seem fearful of people in general.

Karpawich testified that this thought disorder was not substantial. He also stated that during their discussions Thomas indicated that she may have given "too much credence to things that were not that important." Karpawich testified that Thomas acknowledged during their most recent interview that she was "too hypersensitive * * * reading too much into things that weren't there." He also testified that the family reported that Thomas had not made any claims of being followed for the previous two months. Karpawich also said, "She did not think I was part of the conspiracy. She didn't think I was hired by her husband. She did not believe the people she met in the hospital were part of it. She did have concerns with Dr. Pakeeree. Dr. Pakeeree has had a long-standing relationship with her husband. That's not delusional, that's legitimate. She was not pulling other people into the conspiracy."

Karpawich further stated Thomas's delusion is very circumscribed and represents only a limited impairment of her thoughts. He, like Pakeeree, felt that she had no substantial mood, memory, or orientation disorder. Karpawich testified

that Thomas's judgment is not impaired except for the circumscribed area concerning her husband and that she is perfectly able to meet the ordinary demands of life. Concerning the danger Thomas presents to her family or others, Karpawich testified as follows:

"Q. Have you seen any evidence of recent homicidal or other violent behavior exhibited on behalf of or by Linda?

"A. In my time with her, I have never seen her or heard her make any kind of homicidal threats or any kind of homicidal behavior.

"Q. Have any of the people that you talked to, the father the—I'm sorry, her son, her sister, or her daughter indicated to you that they have observed any homicidal behavior or any other type of violent assaultive behavior?

"A. No one that I talked to and none of the records have confirmed assaultive or homicidal behavior. * * * "

Ultimately, Karpawich testified, based upon his own examination and interviews and examination of Thomas's medical records, that he did not believe Thomas met the criteria for involuntary hospitalization.

Thomas's son Andrew, who filed the affidavit against her, testified that his mother had boards with nails sticking up from them at various places on her property and that she claims her house is bugged. Andrew admitted that he had not witnessed his mother placing the boards about her property and also admitted that his mother had never threatened him or his family. His only awareness of any threats made to his father was from his father; Andrew had never heard his mother threaten his father. Andrew testified that his mother was a recovering alcoholic and had been doing well with her sobriety. Although stating that he loved his mother and cared for her very much, Andrew admitted, upon cross-examination regarding his motives for filing the affidavit against his mother, to leaving the following message on his mother's answering machine at 1:30 in the morning:

"Yeah, I'm calling for Linda the Lunatic. You there, mom? You know, I'm just wondering what it's like to be you. Why do you have to hang around somebody like Steve and Linda King? You used to have friends like Susie Leigh. So why are you going from Susie Leigh to Linda King?

"I'd hate to be you, having to look at yourself in the mirror and see what you've done to your retarded daughter and your family, your grown children, and your neighbors.

"How anyone can stand to even look at you or be around you is amazing, because you really turned out to be a nothing.

"I'm so grateful that Grandma Holton passed away where she wouldn't have to see what her daughter has become. It would have broke Grandma's heart."

Thomas's estranged husband, Gale, testified that one night during an argument in which Thomas was accusing him of having her followed, she said, "If you don't stop this, I'm going to kill you." On cross-examination Gale admitted that that was the only time during their thirty-seven-year marriage that Thomas had ever threatened him. He also admitted that the incident had occurred approximately six months prior to the filing of the affidavit against Thomas. Gale corroborated his son's testimony about the boards with nails on Thomas's property and similarly admitted that he had not seen his wife either make them or place them about. Gale testified that Thomas had placed "No Trespassing" signs on her property and had posted surveillance cameras outside the house.[2]

Gale also stated that he had not hired anyone to follow his wife and that she constantly called him to demand that he stop having her followed. Gale testified that his wife was a recovering alcoholic and to his knowledge had been sober since December 1991. He also testified that Thomas had removed all the covers to the electrical outlets and light switches in her house because she believed they were bugged.

Finally, Thomas testified on her own behalf. She admitted to being an alcoholic and to having undergone treatment for approximately three and one-half years. Thomas testified that she has maintained sobriety since December 1991. Thomas also admitted to threatening to kill her husband during an argument some six to nine months prior to the affidavit being filed against her. Thomas stated that her husband had been spontaneously stopping by her home two to three times a day, telling her she needed to get help because she was sick. She testified that she allowed the unannounced visits to agitate her to the point of confrontation. Thomas drove to her husband's apartment and told him to stop interfering in her life. Thomas testified that her husband "was making more remarks such as 'If you would just go get help, you wouldn't get upset.'" Finally, Thomas stated that she told her husband, "I could kill you. I could really kill you." Thomas testified that she then walked out of her husband's apartment and he slammed the door behind her.

Thomas further testified that that single incident was the only time she had ever threatened her husband and that after the incident the two went to Las Vegas in an attempt to reconcile. Thomas stated that her husband had threatened to kill her as well. She also testified that she did not seriously intend to kill

---

2. Apparently, Gale Thomas believes the placement of "No Trespassing" signs evidences a substantially impaired thought process.

her husband and that it "was just the frustration is why I said it. Everyone married has said it some time."

Thomas testified that the boards with nails in them were to prevent raccoons from climbing on her deck. She stated that raccoons would climb onto her deck and leave droppings. Thomas asked her handyman to do something about the problem and directed him to use some means that would not cause permanent harm. She claimed that the type of device and where to place it was his idea, but that she had instructed him not to place them around the house where someone could step on one. Thomas also testified that the boards are no longer in place and have been thrown away. Ultimately, Thomas testified that she would be willing to follow up her counselling on an outpatient basis.

In determining whether a person is subject to hospitalization under R.C. 5122.01(B), a "totality of the circumstances" test should be utilized. *Burton,* 11 Ohio St.3d at 149, 11 OBR at 467, 464 N.E.2d at 534. The test "balances the individual's right against involuntary confinement in deprivation of his liberty, and the state's interest in committing the emotionally disturbed." *Id.* Factors to be considered include (1) whether the individual currently represents a substantial risk of physical harm to himself or others, (2) psychiatric and medical testimony as to the present mental and physical condition of the alleged incompetent, (3) whether the person has insight into his condition, (4) the grounds upon which the state relies for the proposed commitment, (5) any past history which is relevant to establish the individual's degree of conformity with the laws, rules, regulations, and values of society, and (6) if there is evidence the alleged incompetent's mental illness is in remission, what constitutes the cause and degree of the remission and the probability the individual will continue treatment. *Id.* at 149–150, 11 OBR at 467, 464 N.E.2d at 533–535.

Reviewing the totality of the record, we do not find competent and credible evidence to support a determination that the state proved by clear and convincing evidence that Linda Thomas is an individual subject to court-ordered hospitalization pursuant to the criteria set forth in R.C. 5122.01(B). The evidence submitted by the state showed, at best, that Linda Thomas is paranoid concerning her ongoing divorce proceedings and the actions of her husband. The only threat Thomas ever made was not recent and was during an argument with her estranged husband. Such threats are not uncommon between friends or loved ones during heated arguments.

Thomas exhibited no other violent behavior and the witnesses agreed that she could function in society and provide for herself. The credibility of her son was shown to be very questionable. While Linda Thomas may have some paranoia, exhibit some eccentric behavior, and have a family which might be considered

dysfunctional, there is not clear and convincing evidence to support a finding that she presents a substantial risk of physical harm to herself or others, that she cannot provide for her basic needs, or that her behavior creates a grave and imminent risk to substantial rights of others or herself. R.C. 5122.01(B). The finding that Linda Thomas is an individual subject to court-ordered hospitalization is against the manifest weight of the evidence presented.

Thomas's first and second assignments of error are upheld.

### III

The judgment of the probate court finding Linda Thomas to be an individual subject to court ordered hospitalization pursuant to R.C. 5122.01(B) is reversed. Accordingly, judgment is ordered in Linda Thomas's favor pursuant to App.R. 12(B).

*Judgment reversed.*

BAIRD, P.J., and SLABY, J., concur.