[Cite as *State v. Decker*, 2017-Ohio-4266.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                          :

    Plaintiff-Appellee,              :

                                No. 16AP-684

v.                                      :         (C.P.C. No. 14CR-2164)

Louis Decker,                           :         (REGULAR CALENDAR)

    Defendant-Appellant.             :

---

D E C I S I O N

Rendered on June 13, 2017

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Laura R. Swisher*, for appellee. **Argued:** *Laura R. Swisher.*

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant. **Argued:** *George M. Schumann.*

---

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1}   Defendant-appellant, Louis Decker, appeals a September 21, 2016 judgment of the Franklin County Court of Common Pleas committing him to the Columbus Developmental Center pursuant to R.C. 2945.39(D)(1) and 5122.01(B)(1).  For the reasons that follow, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}   On April 24, 2014, a Franklin County Grand Jury indicted Decker for one count of rape and three counts of gross sexual imposition arising from allegations that he fondled and digitally penetrated a nine-year-old girl, H.W., and also forced her to touch his genitals.  (Apr. 24, 2014 Indictment.)  Two months later, the trial court ordered a competency evaluation. (June 9, 2014 Competency Evaluation Order.)

No. 16AP-684

{¶ 3} Pursuant to the court's order, Decker submitted to an evaluation by Dr. Aracelis Rivera, who concluded that Decker was not competent but capable of being restored to competency. (July 8, 2014 Rivera Report.) Dr. Rivera concluded that although Decker performed well on the Competence Assessment for Standing Trial for Defendants with Mental Retardation ("CAST-MR"), Decker lacked a real understanding of the court processes and was not able to appreciate his situation sufficiently to evaluate potential plea bargains. *Id.* at 10-14. The parties stipulated to Dr. Rivera's findings in a hearing on July 30, 2014. (Tr. at 4-5.)

{¶ 4} Following questions in the July 30, 2014 hearing as to whether Decker was "subject to court-ordered institutionalization," on August 1, 2014, Dr. Rivera released an updated report in which she added the opinion that, while Decker was intellectually disabled,[1] he was not subject to institutionalization by court order. (Aug. 1, 2014 Rivera Report at 17.) Approximately one month later on September 5, 2014, the court ordered Decker committed to a secure facility to undergo treatment for a maximum period of one year to restore him to competency. (Sept. 5, 2014 Commitment Entry at 2.)

{¶ 5} On March 18, 2016, the trial court convened a hearing to take evidence on whether Decker had been successfully restored to competency. (Tr. at 8.) Two experts testified at the hearing, Dr. Joseph Kovesdi and Dr. Naeem Khan. (Tr. at 11, 103.) In addition to oral testimony, the trial court had several reports before it. It had the two reports of Dr. Rivera, two reports by Dr. Kovesdi based on evaluations of Decker that took place on July 31, 2015 and February 20, 2016 respectively, and one report by Dr. Khan based on a review of Decker's records and an evaluation of him occurring on December 11, 2015. (Aug. 31, 2015 Kovesdi Report; Jan 5, 2016 Khan Report; Mar. 15, 2016 Kovesdi Report.)

{¶ 6} Dr. Kovesdi's testimony was consistent with his two reports that, in his opinion, Decker was competent to stand trial. (Tr. at 100.) He testified that Decker is

---

[1] The competency procedure statutes were recently amended to remove the use of the term "retarded" and use instead variants of the phrase "intellectual disability." 2016 Am.Sub.H.B. No. 158. In addition, this Court notes that the United States Supreme Court has recently chosen to substitute the term "intellectual disability" for "mental retardation." *Hall v. Florida*, ___ U.S. ___, 134 S. Ct. 1986, 1990 (2014). While some of the reports on assessment of Decker refer to mental retardation as did the statutory language at the time in question, we shall endeavor in this decision to use the modern terminology where possible without creating confusion.

intellectually disabled but is properly categorized in the mild range of intellectual disability. (Tr. at 72-73.) He explained that on both occasions on which he tested Decker, Decker performed better on the CAST-MR than the average competent intellectually disabled person. (Tr. at 19-21, 51-53; Mar. 15, 2016 Kovesdi Report at 3.) He testified that for someone of his intelligence, Decker has a good working memory, is capable of some abstract thinking, is able to categorize, and could assist his attorney in planning a defense. (Tr. at 29, 37, 44-48, 67-68.) He also testified that Decker knew what the charges were, that they were serious, and knew that plea bargaining was making a deal. (Tr. at 53-55.) However, he acknowledged that predicting outcomes was difficult for Decker and that he would have to rely heavily on his attorney in assessing any plea offers. (Tr. at 55-56, 87-88.) He admitted that acquiescence is a personality trait of being intellectually disabled. (Tr. at 83-84.) He also acknowledged that some decisions cannot be made for the client yet simultaneously agreed that Decker would likely defer to his attorney on such matters. (Tr. at 84-86.) Finally, he admitted that Decker would have trouble understanding the trial without special procedures and probably could not testify under cross-examination. (Tr. at 90-92.)

{¶ 7} Dr. Khan testified that Decker was not competent to stand trial. (Tr. at 106.) Dr. Khan explained that Decker has the age equivalence of a nine or ten-year-old. (Tr. at 108-10.) Like a child, he is good at rote memorization, but he lacks more than a rudimentary grasp of abstract or deductive reasoning. (Tr. at 111-13.) Dr. Khan explained that Decker can be taught to parrot vocabulary or understand what the roles of court personnel are but he lacks a real (or intrinsic) understanding of them. (Tr. at 111-13, 117-20, 137-38.) Khan testified that when he administered the CAST-MR to Decker, Decker could answer questions that called for names of things or simple definitions, but on follow-up questioning, Decker showed no understanding of the particular concept. (Tr. at 113-20.) For instance, when asked when a person has to go to jail, Decker was able to correctly select "when you break the law" from multiple choice answers. (Tr. at 114.) But follow-up questioning showed that, to Decker, breaking something was a concrete idea like breaking a glass, and he did not really understand what "breaking the law" was. *Id.* Dr. Khan, like Dr. Kovesdi, testified that acquiescence is a common trait of being intellectually disabled. (Tr. at 139-40.) However, he also explained that there is a difference between understanding and acquiescing through weakness of will as a person

of normal intelligence might do and acquiescing when intellectually disabled, which is more akin to a simple failure to understand how to make a decision. *Id.* Dr. Khan opined that Decker would be likely to acquiesce to almost anything the prosecutor might propose on cross-examination and could easily be talked into pleading guilty to a serious offense because he simply does not understand and therefor acquiesces. *Id.*

{¶ 8} Following the presentation of evidence, the trial court found that Decker was not competent to stand trial. (Tr. at 145-48.) The trial court explained that it found credible testimony that Decker had the mentality of a ten-year-old and that his ability to understand simple, concrete terms, and analogies does not mean that he could comprehend the choices and issues he would face in a trial. *Id.*

{¶ 9} The trial court then held a series of three hearings, on May 26, June 28, and July 14, 2016 on the topic of whether Decker should be subject to the continuing jurisdiction of the court as a person subject to institutionalization by court order due to mental illness or intellectual disability. (Tr. at 150, 190, 243.) The first of the three hearings consisted of arguments by counsel about whether Decker was mentally ill based on the reports and evidence already developed in order to explore the competency issue. (Tr. at 150-89.) Neither side objected to using previously developed materials in arguing this different issue. *Id.*

{¶ 10} In the second hearing, the trial court took evidence on the question of whether Decker committed the offenses with which he was charged. At that hearing, a single witness, a detective from the Franklin County Sheriff's Office ("FCSO"), testified. (Tr. at 191.) The detective recounted that on April 11, 2014, the FCSO received a report from another law enforcement agency that H.W. had been sexually abused by Decker. (Tr. at 193-94, 220.) H.W. was interviewed on April 14, 2014, and the detective testified that he observed that interview. (Tr. at 195-96, 221.) He testified (without defense objection) that H.W. had alleged that Decker touched her vagina and breast and made her touch his penis. (Tr. at 195-96.)

{¶ 11} The detective next testified that he interviewed Decker for over two hours on April 17, 2014. (Tr. at 210-11, 220.) He testified that he was not aware that Decker was intellectually disabled and that Decker had been read his rights and indicated that he understood. (Tr. at 209-10.) He explained that during the interview Decker initially

denied the allegations. (Tr. at 212.) But after the detective and the other interviewers (there were one to three in the room at a time) repeatedly told Decker that he was lying, after they had Decker perform a "stress test," after they informed him that the test showed he was lying, and after they brought Decker's girlfriend into the interrogation to encourage him to confess, Decker broke down and admitted he had touched H.W. inappropriately. (Tr. at 200, 211-16; Interview Video in passim). Approximately the final 20 minutes of the interview were introduced into evidence and played during the hearing. (Tr. at 202.)

{¶ 12} During the video, on the occasions that Decker managed to speak intelligibly, he did not sound obviously mentally handicapped. (Interview Video in passim.) However, during much of the approximately 20-minute video depicting the end of the over two-hour interrogation, Decker was crying and hyperventilating. *Id.* During the video, the police and his girlfriend told him that he should confess and after approximately several minutes of sobbing, Decker admitted to touching H.W.'s privates. *Id.* at 0:00-4:15. Initially Decker denied that his fingers went inside H.W. at all. *Id.* at 12:25-14:15. But after prompting from the officers and repeated suggestions that Decker was still lying, Decker admitted that his fingers could have gone in slightly. *Id.*

{¶ 13} The final hearing on July 14, 2016 consisted solely of the court's decision delivered orally on the record. (Tr. at 243-55.) The parties had argued about whether Decker was subject to court ordered institutionalization based on R.C. 5122.01(B)(4) (that the person "[w]ould benefit from treatment for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person"). (Tr. at 228-36.) Yet in enunciating its ruling, the trial court instead focused on R.C. 5122.01(B)(2) (that the person "[r]epresents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness"). *Compare* Tr. at 228-36 *with* Tr. at 251-52. The trial court orally found, by clear and convincing evidence, that Decker had committed the offenses with which he was charged and that he was a mentally ill person subject to court

No. 16AP-684

order. (Tr. at 243-54.) The trial court issued an entry memorializing the findings on September 21, 2016. (Sept. 21, 2016 Entry.)

{¶ 14} Decker now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 15} Decker posits two assignments of error:

> [1.] The trial court abused its discretion by solely relying on psychological testimony and reports from a previous R.C. 2945.38(H) competency hearing to make findings of mental illness and court-ordered hospitalization in a subsequent R.C. 2945.39(A)(2) hearing.
>
> [2.] The trial court's finding that the defendant-appellant was a mentally ill person subject to court order was against the manifest weight of the evidence.

For clarity we discuss them in reverse order.

## III. DISCUSSION

### A. Second Assignment of Error—Whether the Trial Court Erred in Finding that Decker was a Mentally Ill Person Subject to Court-Ordered Hospitalization

#### 1. Standard of Review

{¶ 16} Many jurisdictions have reviewed and continue to review commitment decisions using the highly deferential "civil" manifest weight standard set forth in *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978). *See, e.g., State v. McIntosh*, 2d Dist. No. 26445, 2015-Ohio-2786, ¶ 6; *State v. Sloan*, 11th Dist. No. 2007-L-053, 2007-Ohio-6558, ¶ 16-17; *see also State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24-26 (explaining the distinction formerly drawn between the "civil" and "criminal" manifest weight standards). However, the Supreme Court of Ohio clarified in 2012 that there is no separate "civil" manifest weight standard—rather the same manifest weight standard from criminal cases (as set forth in *State v. Thompkins*) applies in civil cases. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 14-23, citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997) (critiquing the use of the "some competent, credible evidence"

No. 16AP-684

standard set forth in *C.E. Morris* as having resulted in an incorrect merger of the concepts of weight and sufficiency).[2]

{¶ 17} Prior to the decision in *Eastley* limiting *C.E. Morris'* deferential "civil" manifest weight standard, this Court had determined there was a question as to which of the two alternative standards should be used when commitment orders were under appellate review:

> *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578 ("Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."). This is known as the manifest-weight standard of review for verdicts in *civil* cases. *See, e.g., State v. Wilson*, 113 Ohio St.3d 382, 2007 Ohio 2202, ¶ 24, 865 N.E.2d 1264 (referring to "a civil manifest-weight-of-the-evidence standard."). In criminal cases, the standard of review is somewhat different. *See id.* at ¶ 25 (citing *State v. Thompkins*, 78 Ohio St.3d 380, 1997 Ohio 52, 678 N.E.2d 541). "In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively." *Wilson* at ¶ 25. Although both *C.E. Morris Co.* and *Thompkins* afford the trial court's fact determinations great deference, under the former, the reviewing court affords more deference to the trial court's findings than under the latter. *Id.* at ¶ 26.
>
> *C.E. Morris Co.* and *Thompkins* notwithstanding, the textbook standard of review for decisions finding a person mentally ill and subject to court-ordered hospitalization, is clear and convincing evidence. *See* William H. Wolff Jr., *et al.*, *Anderson's Appellate Practice & Procedure in Ohio* (2006 ed.Lexis) 97 (citing *In re Mental Illness of Thomas* (1996), 108 Ohio App.3d 697, 700, 671 N.E.2d 616); *see also State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54 ("Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier

---

[2] The Supreme Court, without citing either *Eastley* or *Thompkins*, recently quoted *C.E. Morris* and its immediate successor, *Seasons Coal Co. v. Cleveland*, in a criminal case for the manifest weight standard. *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, ¶ 63, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984); *C.E. Morris* at syllabus. Even at the time when the *C.E. Morris* "some competent, credible evidence" standard was in favor, it was applicable only in civil, not criminal, cases. *Wilson* at ¶ 24-26 (explaining the difference between the "civil" and "criminal" manifest weight standards).

No. 16AP-684

> of facts had sufficient evidence before it to satisfy the requisite degree of proof."). * * *
>
> * * *
>
> There is no dispute that involuntary commitments are civil in nature. The only question is whether the standard of review is governed by the clear and convincing standard, as in *Scheibel* [sic] and *In re Mental Illness of Thomas, supra*, or whether we must affirm the probate court's judgment if there is competent, credible evidence to support it, as in *C.E. Morris Co.*

Licking & Knox Community Mental Health & Recovery Bd. v. T.B., 10th Dist. No. 10AP-454, 2010-Ohio-3487, ¶ 4-5, 8.

{¶ 18} We never resolved the question set forth in *Licking & Knox*. But, upon our present revisit of the issue, we find that the Supreme Court has effectively resolved it by clarifying that *C.E. Morris* should not have been read to have created a distinct and more deferential manifest weight standard for civil cases and that sufficiency and weight are distinct concepts. *Eastley* at ¶ 8-23. Freed of the *C.E. Morris* standard, we rely instead on the language of the statute and the alternative proposed by *Licking & Knox*. We thus review Decker's appeal based on whether the trial court had evidence before it that was both sufficient and weighty enough to find the elements necessary for commitment by "clear and convincing evidence." R.C. 2945.39(A)(2); *Licking & Knox* at ¶ 5. Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt. *Id.*

### 2. Whether Decker was a Mentally Ill Person Subject to Court Order

{¶ 19} In the case of a defendant such as Decker who is found incompetent to stand trial and not restored to competency within the time limit provided in R.C. 2945.38(C), the Ohio Revised Code provides:

> (2) On the motion of the prosecutor or on its own motion, the court may retain jurisdiction over the defendant if, at a hearing, the court finds both of the following by clear and convincing evidence:

No. 16AP-684

> (a) The defendant committed the offense with which the defendant is charged.
>
> (b) The defendant is a mentally ill person subject to court order or a person with an intellectual disability subject to institutionalization by court order.

R.C. 2945.39(A)(2)(a) and (b); *see also* R.C. 2945.38(C)(1)(b). A "[p]erson with an intellectual disability subject to institutionalization by court order" must, among other criteria, have "at least a moderate level of intellectual disability" characterized by a number of factors including a full-scale IQ at or below 55. R.C. 5123.01(O) and (P). Decker does not meet these criteria, being more high functioning but nevertheless intellectually disabled. Since his disability was not "at least a moderate level of intellectual disability," the trial court apparently focused instead on whether Decker was "a mentally ill person subject to court order." R.C. 2945.39(A)(2)(b).

{¶ 20} Mental illness is defined as "a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life." R.C. 5122.01(A). The Ohio statutory definition of "mentally ill person subject to court order" is potentially relevant to Decker as follows:

> "Mentally ill person subject to court order" means a mentally ill person who, because of the person's illness:
>
> * * *
>
> (2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;
>
> * * *
>
> (4) Would benefit from treatment for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person.

No. 16AP-684

R.C. 5122.01(B).[3]  Although the statutory language does not indicate whether this list is conjunctive or disjunctive, the Supreme Court has stated that the definition may be satisfied if at least one of the categories is met.  *In re Mental Illness of Boggs*, 50 Ohio St.3d 217, 219 (1990).  The totality of the circumstances are also to be considered in evaluating whether a person should be committed for hospitalization, including but not limited to:

> (1) whether, in the court's view, the individual currently represents a substantial risk of physical harm to himself or other members of society; (2) psychiatric and medical testimony as to the present mental and physical condition of the alleged incompetent; (3) whether the person has insight into his condition so that he will continue treatment as prescribed or seek professional assistance if needed; (4) the grounds upon which the state relies for the proposed commitment; (5) any past history which is relevant to establish the individual's degree of conformity to the laws, rules, regulations and values of society; and (6) if there is evidence that the person's mental illness is in a state of remission, the court must also consider the medically suggested cause and degree of the remission and the probability that the individual will continue treatment to maintain the remissive state of his illness should he be released from commitment.

*In re Burton*, 11 Ohio St.3d 147, 149 (1984).

{¶ 21}  The trial court ordered Decker to be committed because it found (1) that he had committed the crime with which he was charged, (2) that he was mentally ill, and (3) that he "[r]epresent[ed] a substantial risk of physical harm to others as manifested by * * * other evidence of present dangerousness."  R.C. 5122.01(B)(2); R.C. 2945.39(A)(2)(a) and (b).  Specifically, the trial court stated:

> In the instant case there is clear and convincing evidence -- this courts [sic] finds that there is clear and convincing evidence that the defendant sexually assaulted [H.W.] beginning when she was age seven and ending when she was

---

[3] R.C. 5122.01(B)(1), (3), and (5) also include several provisions related to whether such persons are likely to harm themselves intentionally or through neglect and whether such persons are unable to survive without supervision as demonstrated by a history of lack of compliance with treatment.  Decker gave no indications of being likely to inflict harm on himself (either purposefully or neglectfully) and had no history of noncompliance with treatment.  Thus, there is no value in exploring those portions of the statute in this case.

No. 16AP-684

> age nine.  The evidence and the defendant's own admission support the conclusions that the defendant touched [H.W.]'s breasts and vaginal area, inserted his finger or fingers in her vagina, and made [H.W.] touch his penis.  To subject a child to this kind of lawless, traumatic, and essential [sic] behavior is, in this court's belief, clear and convincing evidence of the defendant's present dangerousness as outlined in 5122.01 Subsection B2.

(Tr. at 251-52.)

{¶ 22} As to whether Decker committed the crimes for which he was charged, the evidence was presented by a single detective witness.  The detective showed a video of a short portion of a more than two-hour interview in which Decker admitted the offense.  (Tr. at 202, 211-16; Interview Video in passim.)  While, in normal circumstances, that would be strong evidence, Decker's circumstances are not normal.  Decker is intellectually disabled and, as is typical for such persons, is prone to acquiescence on matters which he does not understand.  (Tr. at 139-40.)  Thus, it seems unlikely that he understood and voluntarily waived his *Miranda*[4] rights from the single read-through administered by the detectives.  (Tr. at 210.)  While constitutional issues underlying *Miranda* have less applicability in civil proceedings like commitments, the fact that Decker probably did not understand his rights casts doubts on the voluntariness (and thus reliability) of his confession, lessening its value as evidence.  *State v. Williams*, 126 Ohio St.3d 65, 2010-Ohio-2453, paragraph two of the syllabus.

{¶ 23} It is also troubling that Decker only confessed after the detective and the other interviewers (there were one to three in the room at a time) repeatedly told Decker over the course of more than two hours that he was lying, after they brought Decker's girlfriend into the interrogation to encourage him to confess, and after they had Decker perform a "stress test" and informed him that the test showed he was lying.  (Tr. at 200, 211-16; Interview Video in passim.)  Decker's mannerisms and mode of speech as recorded in the video interview did not obviously indicate that he had an intellectual disability, and the detective testified that he was not aware of Decker's disability.  (Tr. at 209-10.)  But Decker's low effective mental age and hysteria during the latter portion of the interrogation—the part of the interview shown at the hearing—raise more questions

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

No. 16AP-684

about his confession, further impugning its reliability as evidence. (Interview Video in passim.)

{¶ 24} The confession was corroborated only through hearsay testimony by the detective to the effect that H.W. said that Decker touched her vagina and breast and made her touch his penis. (Tr. at 195-96.) While the hearsay was admitted without objection, the Supreme Court has recognized that one of the rationales for excluding hearsay is "because it is unreliable." *State v. Young*, 5 Ohio St.3d 221, 223 (1983) ("Hearsay is inadmissible because it is unreliable."); *see also, e.g.*, *State v. Roquemore*, 85 Ohio App.3d 448, 453 (10th Dist.1993) ("excludable hearsay is inadmissible because it is relevant but unreliable"). Moreover, the Ohio Rules of Evidence provide that children under ten years of age (like H.W.) are incompetent to testify if they "appear incapable of receiving just impressions of the facts * * * or of relating them truly." Evid.R. 601(A). While H.W. may have been truthful and accurate despite her age, because her statements were delivered via the inherently unreliable hearsay statements of another, the trial court had no opportunity to ascertain for itself H.W.'s competency to testify or her credibility if she was competent enough.

{¶ 25} In short, Decker's confession was not strong evidence, having been obtained during a two-hour interrogation of a semi-hysterical intellectually disabled man who it cannot be said with certainty understood or voluntarily waived his *Miranda* rights. The corroborating testimony was hearsay about the contents of a nine-year-old's statements made without any prior court determination of her competency pursuant to Evid.R. 601(A). These circumstances cast doubt about whether the trial court had before it clear and convincing evidence that Decker committed the offenses with which he was charged. But Decker's counsel disclaimed this during oral argument stating "the 'whether he did it part' is done and over with and I'm not disputing that." (Apr. 26, 2017 Oral Argument at 9:26:31-9:26:37.) Thus, that issue has been purposely waived by defense counsel on appeal, not having been challenged before the trial court by previous counsel.

{¶ 26} In the next step of the analysis, the trial court concluded Decker was mentally ill. (Tr. at 249-51.) From a medical, scientific point of view, concluding there exists an intellectual disability is a different diagnosis than concluding there exists mental illness. But when a court construes the statute for the hospitalization of a mentally ill

No. 16AP-684

person, it must abide by the plain meaning of the definition of mental illness as set forth in R.C. 5122.01(A). *In re McKinney*, 8 Ohio App.3d 278, 280-81 (10th Dist.1983). ("If a substantial disorder of thought, mood, perception, orientation or memory grossly impairs judgment, behavior or ability to meet the ordinary demands of life, it is a 'mental illness' as defined by R.C. 5122.01 (A), irrespective of whether the disorder is caused by mental retardation or some type of organic illness." *Id.* at syllabus.) Thus, even though Decker's diagnosis is mental retardation and not mental illness, under *McKinney,* the trial court may find that Decker's intellectual disability manifested in such a way that he meets the definition of mental illness in R.C. 5122.01(A). Thus, the fact that all three experts in this case who examined Decker found no mental illness is not dispositive under *McKinney*. (July 8, 2014 Rivera Report at 15; Aug. 1, 2014 Rivera Report at 15; Aug. 31, 2015 Kovesdi Report at 2, 5; Jan. 5, 2016 Khan Report at 5, 15;[5] Mar. 15, 2016 Kovesdi Report at 2, 5.) Accordingly, our review turns on whether the trial court should have found by clear and convincing evidence that Decker met the statutory definition of mental illness for purposes of making him subject to court order pursuant to R.C. 5122.01(B).

{¶ 27} All three experts agreed that Decker was intellectually disabled, two of whom believed he was intellectually disabled to the extent that he was incompetent to stand trial. (July 8, 2014 Rivera Report at 15; Aug. 1, 2014 Rivera Report at 15; Aug. 31, 2015 Kovesdi Report at 2, 4-5; Jan. 5, 2016 Khan Report at 23; Mar. 15, 2016 Kovesdi Report at 2, 5.) And Dr. Khan explained in his report the barriers Decker faces as a result of his "extremely low * * * intellectual functioning" and "moderate to mild deficits noted in his adaptive behavior." (Jan. 5, 2016 Khan Report at 22.) Dr. Khan stated that a disability of Decker's magnitude results in:

> [G]ross cognitive, social, and personal deficits that affect his intellectual and cognitive processing power, his ability to learn new paradigms, and it impairs his judgment and reasoning, his memory, his ability to analyze and problem solve and his decision making ability. The condition is marked by the near absence of abstract thought processing, poor social

---

[5] Though Dr. Khan's 24-page report stated in one place that Decker had a mental illness, this conclusion was repeated nowhere else in the report and was neither analyzed nor supported. (Jan. 5, 2016 Khan Report at 23 and in passim.) Thus, we question whether the phrase was included on page 23 of the report in error.

No. 16AP-684

> perspective taking ability and failure to generalize learning. It results in deficits in attention span, span of comprehension, self-initiative and self-direction. Having little personal resources, an individual with this condition is given to reliance upon others and readily acquiesce to please others. Adding to their general risk, such persons tend to have poor coping skills, are given to impulsivity and low frustration tolerance when faced with stressful or taxing situations and respond in atypical ways. Such persons require supervision, structure and supports to enable them to safely function and meet daily needs across all domains of living.

*Id.*

{¶ 28} With regard to whether Decker "[r]epresent[ed] a substantial risk of physical harm to others as manifested by * * * other evidence of present dangerousness," the trial court found that evidence Decker committed the crime involving sexually abusing H.W., sufficiently satisfied that criteria. R.C. 5122.01(B)(2); Tr. at 251-52. Despite the questions surrounding the reliability of that evidence, the record does contain other evidence of Decker's potential dangerousness. Dr. Khan, for example, wrote the following in his report:

> [Decker] is an at risk person who will re-offend because of his deficient cognitive constitution, poor insight and poor judgment. Absence of necessary supervision, support and services places this man of poor social skills at the mercy of his urges, impulses and whims. Unchecked and unprotected any adult male mentally retarded person with a deficient support system will repeatedly place himself in harms way and present a danger to self and others. [Decker] may come across as a street smart person who can negotiate city life in terms of mobility or accessing limited resources and destinations, but in reality he has limited and poor judgment and deficient personal resources. [Decker] relies upon others to manage his personal affairs. Due to compounding serious offense history now, the untimely death of his mother as he is awaiting trial, on going atypical family dynamics and almost certain dissolution of support from the victim's family with whom he spent a lot of time have made his life ecology even more constricting. [Decker's] life events are certainly set to take a turn for the worse if he is returned to the community without wrap around services. Incarcerating him will subject him to physical and psychological abuse and will be to his further detriment. [Decker's] IQ does not fall below 56, a cutoff point for forced/court ordered civil commitment to a

state operated developmental center per Ohio Revised Code. He could continue to be held there under criminal court jurisdiction. But more importantly the over-arching need is his and others safety as part of immediate treatment for his psycho-sexual affliction and his developmental disorder. To this end he should be placed in an exclusive setting for persons with intellectual disability/mental retardation who have offended. There are very few such facilities that treat MR sex offenders. In Columbus, the Wittwer Hall program of Alvis Inc., is one such options [sic] that should be looked into. The supervision, structure and supports made available in their certified inpatient mental retardation facilities can address the prospective cycle of violence in his life. Wrapped around support services and a viable relapse prevention plan would go a long way in averting a tragedy in the making that has already unfolded. Programs for mentally retarded sex offenders and offenders in general have high relapse rates if they are not maintained throughout the persons [sic] life context and futures planning. Any structured, viable plan must involve protection from harm for [Decker] as well as the community at large and must be an investment for the long haul.

(Jan. 5, 2016 Khan Report at 21-22.)

{¶ 29} Under the circumstances, we are unable to conclude that the trial court erred in finding that Decker was a mentally ill person subject to court order. We overrule Decker's second assignment of error.

## B. First Assignment of Error—Whether the Trial Court Abused its Discretion by Relying on Psychological Testimony and Reports from a Competency Hearing to Find Decker Subject to Court-Ordered Hospitalization

{¶ 30} Decker argues that the trial court erred in relying on the competency reports of Doctors Rivera, Kovesdi, and Khan in assessing whether he was "a mentally ill person subject to court order" rather than reports directly speaking to that inquiry. (Decker Brief at 30-44.) However, R.C. 2945.39(B) provides that in making the determination of whether a person is subject to court order as contemplated in division (A) of the section, "the court may consider all relevant evidence, including, but not limited to, any relevant psychiatric, psychological, or medical testimony or reports, the acts constituting the offense charged, and any history of the defendant that is relevant to the defendant's ability

No. 16AP-684

to conform to the law."  The trial court has "broad discretion" as to what to review in making determinations under R.C. 5122.01(B).  *In re Burton* at 149.

{¶ 31} And neither side objected to the use of the already existing competency reports for determining the questions of mental illness and institutionalization.  (Tr. at 150-89.)  We review the propriety of considering such reports not only for abuse of "broad discretion" but also for plain error.  The Supreme Court has described a plain error analysis as follows:

> Crim.R. 52(B) affords appellate courts discretion to correct "[p]lain errors or defects affecting substantial rights" notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court. However, the accused bears the burden of proof to demonstrate plain error on the record, and must show "an error, i.e., a deviation from a legal rule" that constitutes "an 'obvious' defect in the trial proceedings[.]" However, even if the error is obvious, it must have affected substantial rights, and "[w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." The accused is therefore required to demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims.

(Citations omitted.) *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22.

{¶ 32} A defendant is incompetent to stand trial when a court finds, by a preponderance of the evidence that "because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense."  R.C. 2945.37(G).  On the face of the statutes, this inquiry is very different from the question of whether a defendant "is a mentally ill person subject to court order" as set forth above and in R.C. 2945.39(A)(2)(b) and 5122.01(B).

{¶ 33} All three experts' reports focused on the issues of whether Decker could understand the charges against him and assist his counsel in his defense.  (July 8, 2014 Rivera Report; Aug. 1, 2014 Rivera Report; Aug. 31, 2015 Kovesdi Report; Jan. 5, 2016 Khan Report; Mar. 15, 2016 Kovesdi Report.)  All three experts also briefly considered whether Decker should be committed due to his intellectual disability, with all three concluding that he could not be as he did not meet the legal criteria.  (Aug. 1, 2014 Rivera

No. 16AP-684

Report at 17; Aug. 31, 2015 Kovesdi Report at 5; Jan. 5, 2016 Khan Report at 21; Mar. 15, 2016 Kovesdi Report at 5.) All three additionally concluded that Decker did not suffer from a mental illness and, thus, it could also reasonably be said that they implicitly opined that he should be committed as a mentally ill person. (July 8, 2014 Rivera Report at 15; Aug. 1, 2014 Rivera Report at 15; Aug. 31, 2015 Kovesdi Report at 2, 5; Jan. 5, 2016 Khan Report at 5, 15; Mar. 15, 2016 Kovesdi Report at 2, 5.)

{¶ 34} However, this Court explained in *McKinney* that the terms "mental illness" and "mentally ill person" are to be defined according to the Ohio Revised Code, not interpreted according to how the psychiatric profession may define the phrases. *In re McKinney*. Thus, even though none of the experts diagnosed Decker as mentally ill, the trial court still could have drawn that conclusion if Decker met the statutory definition. Thus, the trial court could properly rely on the reports to commit Decker if they contained information relevant to whether Decker suffered from "a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life." R.C. 5122.01(A).

{¶ 35} All five reports from the three experts contained evaluations of Decker's mental state and his ability to perceive and judge situations. (July 8, 2014 Rivera Report at 6-14; Aug. 1, 2014 Rivera Report at 6-16; Aug. 31, 2015 Kovesdi Report 2-4; Jan. 5, 2016 Khan Report at 5-23; Mar. 15, 2016 Kovesdi Report at 2-5.) These reports supported the trial court's determination of whether Decker was "incapable of understanding the nature and objective of the proceedings against [him] or of assisting in [his] defense." R.C. 2945.37(G). Most of the reports did not conclude that Decker's deficits were "substantial" or that they resulted in "gross[]" impairment as contemplated in R.C. 5122.01(A). However, Dr. Khan stated that an intellectual disability of Decker's magnitude results in deficits that require supervision for safe functioning. (Jan. 5, 2016 Khan Report at 22.)

{¶ 36} The reports generally did not comment as to Decker's dangerousness (which is a critical requirement for committing a person under both case law and statute). *See Williams* at ¶ 32; R.C. 5122.01(B). However, Dr. Kahn 's report as offered (and as reproduced in fuller detail above) indicates that Decker is likely to reoffend because of his cognitive deficiencies. (Jan. 5, 2016 Khan Report at 21-22.)

No. 16AP-684

{¶ 37} While it would have been preferable for the trial court to have obtained reports directly on the topic of whether Decker was mentally ill and dangerous to others, we are unable to find abuse of discretion or plain error in the trial court's reliance on the competency reports for this purpose. All the reports addressed Decker's ability to accurately perceive events, judge them, and behave appropriately. Dr. Khan's report also gave meaningful analysis to Decker's dangerousness and his ability to meet his daily needs. Decker's first assignment of error is overruled.

## IV. CONCLUSION

{¶ 38} We affirm the conclusion of the trial court that, based on clear and convincing evidence before it, Decker was a mentally ill person subject to court order. We find no abuse of discretion or plain error in the trial court's reliance on relevant expert reports notwithstanding the fact that the reports were not specifically generated for the purpose of evaluating whether Decker should be institutionalized. Accordingly, we overrule both of Decker's assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT, J., concurs.
DORRIAN, J., concurs in part and in judgment.

DORRIAN, J., concurring in part and in judgment.

{¶ 39} I concur with the majority that the trial court did not err in finding that appellant was mentally ill pursuant to the definition set forth in R.C. 5122.01(A). I also concur that the trial court did not commit plain error in relying on the competency reports of Drs. Rivera, Kovesdi, and Khan in assessing whether appellant was mentally ill. However, because appellant did not assert error regarding the trial court's finding that appellant committed the offenses with which he was charged, I would not address the same as the majority has at paragraphs 22-25.

————————————