[Cite as *State v. Decker*, 2020-Ohio-1464.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 16AP-684 |
| v. | : | (C.P.C. No. 14CR-2164) |
| Louis Decker, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on April 14, 2020

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee.

**On brief:** *Yeura R. Venters*, Public Defender, *Terrence K. Scott*, and *Patrick T. Clark,* for appellant.

REOPENED APPEAL from the Franklin County Court of
Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Louis Decker, previously appealed a September 21, 2016 entry of the Franklin County Court of Common Pleas committing him to the Columbus Developmental Center pursuant to R.C. 2945.39(D)(1) and 5122.01(B)(2). *State v. Decker*, 10th Dist. No. 16AP-684, 2017-Ohio-4266 ("*Decker I*"). We affirmed the commitment decision. *Id.* However, in a memorandum decision issued on December 5, 2017, we granted an application for reopening of the appeal pursuant to App.R. 26(B). *State v. Decker*, 10th Dist. No. 16AP-684, ¶ 14-25 (Dec. 5, 2017) (memorandum decision) ("*Decker II*"). Because we find that trial counsel was ineffective in failing to adequately contest the question of Decker's guilt and because appellate counsel was likewise ineffective in failing to raise that issue on appeal, we vacate our prior decision and reverse.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}   Decker was indicted on April 24, 2014, for one count of rape and three counts of gross sexual imposition arising from allegations that he fondled and digitally penetrated a nine-year-old girl, H.W., and also forced her to touch his genitals.  (April 24, 2014 Indictment.)  It is undisputed that Decker is intellectually disabled and has the mentality of a nine or ten-year-old.  *Decker I* at ¶ 2-8.  Based on a series of medical examinations, an evaluation period of slightly less than one year, written reports of several experts, and live hearings, the trial court found that Decker was not competent to assist in his defense and could not be criminally tried.  *Id.* (Tr. at 145-48).

{¶ 3}   The trial court then took up the question of whether Decker should be subject to the continuing jurisdiction of the court as a person subject to institutionalization by court order due to mental illness or intellectual disability.  *Decker I* at ¶ 9. (Tr. at 150, 190, 243.) One necessary component of that inquiry was whether there was clear and convincing evidence that "[t]he defendant committed the offense with which the defendant [was] charged."  R.C. 2945.39(A)(2)(a).  We have previously summarized the evidence presented on that issue:

> [A detective with the Franklin County Sheriff's Office] recounted that on April 11, 2014, the FCSO received a report from another law enforcement agency that H.W. had been sexually abused by Decker. (Tr. at 193-94, 220.) H.W. was interviewed on April 14, 2014, and the detective testified that he observed that interview. (Tr. at 195-96, 221.) He testified (without defense objection) that H.W. had alleged that Decker touched her vagina and breast and made her touch his penis. (Tr. at 195-96.)
>
> The detective next testified that he interviewed Decker for over two hours on April 17, 2014. (Tr. at 210-11, 220.) He testified that he was not aware that Decker was intellectually disabled and that Decker had been read his rights and indicated that he understood. (Tr. at 209-10.) He explained that during the interview Decker initially denied the allegations. (Tr. at 212.) But after the detective and the other interviewers (there were one to three in the room at a time) repeatedly told Decker that he was lying, after they had Decker perform a "stress test," after they informed him that the test showed he was lying, and after they brought Decker's girlfriend into the interrogation to encourage him to confess, Decker broke down and admitted he had touched H.W. inappropriately. (Tr. at 200, 211-16;

Interview Video in passim). Approximately the final 20 minutes of the interview were introduced into evidence and played during the hearing. (Tr. at 202.)

During the video, on the occasions that Decker managed to speak intelligibly, he did not sound obviously mentally handicapped. (Interview Video in passim.) However, during much of the approximately 20-minute video depicting the end of the over two-hour interrogation, Decker was crying and hyperventilating. *Id.* During the video, the police and his girlfriend told him that he should confess and after approximately several minutes of sobbing, Decker admitted to touching H.W.'s privates. *Id.* at 0:00-4:15. Initially Decker denied that his fingers went inside H.W. at all. *Id.* at 12:25-14:15. But after prompting from the officers and repeated suggestions that Decker was still lying, Decker admitted that his fingers could have gone in slightly. *Id.*

*Decker I* at ¶ 10-12.

{¶ 4} On direct appeal, we noted some significant unanswered questions about the vigor of his defense and the reliability of the evidence presented to the trial court on the question of Decker's guilt. *Id.* at ¶ 22-25. Specifically, we noted that Decker (an intellectually disabled man prone to acquiesce and agree with any forceful suggestion) only confessed after the detective and the other interviewers repeatedly told Decker over the course of more than two hours that he was lying, after they brought his girlfriend into the interrogation to encourage him to confess, and after they had Decker perform a "stress test" and informed him that the test showed he was lying. *Id.* at ¶ 7, 22-23; *see also* Tr. at 200, 211-16; Interview Video in passim. We also observed that this confession was corroborated only by the unsworn out of court statement of the child victim, as relayed through the hearsay testimony of a detective, without consideration of whether a hearsay exception enhanced the statement's reliability to the point of admissibility or whether the child victim (who was under ten years of age) was competent to testify under Evid.R. 601(A). *Decker I* at ¶ 24. Nevertheless, we observed that these issues were not raised in the trial court or on appeal, and Decker's appellate counsel stated, during oral argument, "the 'whether he did it part' is done and over with and I'm not disputing that." *Id.* at ¶ 25. (Apr. 26, 2017 Oral Argument at 9:26:31-9:26:37.) We therefore declined to address such matters further. *Decker I* at ¶ 25.

{¶ 5}   On September 13, 2017, Decker (now represented by different appellate counsel) applied to reopen the direct appeal under App.R. 26(B).   (Sept. 13, 2017 Application for Reopening.)   Based on the arguments presented and an affidavit from Decker's former appellate counsel, we found genuine questions as to whether appellate counsel had rendered ineffective assistance in two ways: first, by failing to argue that trial counsel had performed ineffectively, and second, by failing to assert that the trial court erred in finding clear and convincing evidence of Decker's guilt.  *Decker II* at ¶ 14-25.

{¶ 6}   The parties have now filed new briefing and the appeal is once again before this Court.

## II. ASSIGNMENTS OF ERROR

{¶ 7}   In this reopened appeal, Decker raises three assignments of error for review:

[1.] The trial court violated Mr. Decker's rights to due process and a fair trial when it found that Mr. Decker, without clear and convincing evidence, committed acts of sexual assault in violation of R.C. 2945.39(A)(2)(a). Fifth and Fourteenth Amendments, United States Constitution; Article I, Section 16 of the Ohio Constitution.

[2.] Defense counsel provided ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

[3.] Previous appellate counsel rendered ineffective assistance, in violation of Mr. Decker's rights under the Fourteenth Amendment to the United States Constitution, and Article I, Section 16 of the Ohio Constitution.

## III.  DISCUSSION

### A.  Standard – Ineffective Assistance of Counsel

{¶ 8}   We discuss Decker's second assignment of error first, concerning ineffective assistance of counsel.  Ineffective assistance of counsel claims are reviewed using the two-pronged approach set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "First, the defendant must show that counsel's performance was deficient.  * * *  Second, the defendant must show that the deficient performance prejudiced the defense."  *Id.* at 687.  In evaluating counsel's performance, "[a] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the

challenged action 'might be considered sound trial strategy.' " *Id.* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955); *see also State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 37. To show that a defendant has been prejudiced by counsel's deficient performance, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694; *see also State v. Griffin*, 10th Dist. No. 10AP-902, 2011-Ohio-4250, ¶ 42, quoting *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

## B. Second Assignment of Error – Whether Trial Counsel Rendered Ineffective Assistance of Counsel

{¶ 9} As we recognized in *Decker II*, because Decker was accused of rape of a child, if the trial court determined that he committed the offense and decided to institutionalize him, the period of commitment was going to be essentially lifelong. *Decker II* at ¶ 22; R.C. 2945.401(J)(1)(a) through (c); R.C. 2907.02(A)(1)(b); R.C. 2907.02(B). Decker's trial counsel also acknowledged this fact:

> Your Honor, this is a very important proceeding in Louis Decker's life. The lead charge on this case is rape of a child under ten, which carries a potential of life imprisonment. So as a result of this hearing, it may involve Louis being committed under the jurisdiction of this court for the rest of his life.

(Tr. at 164.)

{¶ 10} Yet, despite acknowledging the gravity of the situation, Decker's defense counsel presented neither evidence nor witnesses in his defense. (Tr. at 164, 190-242.) Although counsel speculated during closing that, in a trial, it was "entirely possible that th[e] interview [in which Decker confessed] would not have been able to be admitted as evidence," defense counsel did not object to the introduction of the partial recording. (Tr. at 233-34.) Despite the existence of numerous authorities suggesting that tactics of the sort used by detectives in this case pose a significant danger of eliciting false confessions from mentally disabled suspects (like Decker), counsel did not, either orally or in writing, present such authorities or call a witness to testify regarding such matters. (Mar. 22, 2018 Decker's Brief at 20-22.) *Hall v. Florida*, 572 U.S. 701, 709 (2014); *Miranda v. Arizona*, 384 U.S. 436, 455-56, fn. 24 (1966). (Tr. at 190-227.)

{¶ 11} Moreover, in closing, although the rape and gross sexual imposition charges were closely linked (and separated only by the question of whether Decker ever put his fingers inside the victim's vagina in the course of committing gross sexual imposition), Decker's defense counsel admitted that the State had "[p]erhaps" met its burden "with gross sexual imposition, but not rape." (Tr. at 235.) At another point in defense counsel's closing, she again appeared to concede Decker's guilt by arguing that no evidence was presented that Decker had "done this more than once or that [Decker] ha[d] expressed any ideation that he [was] going to do this again." (Tr. at 237.) In total, the hearing on whether Decker had committed an offense that would result in lifelong confinement consisted of one witness (the detective) testifying in one morning session, spanning just 53 pages of transcript (including all opening and closing proceedings). (Tr. at 190-242.)

{¶ 12} The transcript of the hearing on whether Decker committed the offense leaves the reader with the unmistakable impression that defense counsel chose to present only token resistance on this issue. (Tr. 150-253.) Indeed, defense counsel spent a significant portion of her closing during the hearing arguing not about guilt but instead about treatment Decker could receive, his propensity to reoffend, and whether he was mentally ill. (Tr. at 236-38.) Where a lifetime of confinement was at stake, and where the evidence against Decker was subject to a number of serious unanswered questions about its reliability, this was deficient representation to such an extent that our confidence in the outcome of the hearing is undermined. *Strickland*, 466 U.S. at 687, 694.

{¶ 13} Decker's second assignment of error is sustained.

## C. Third Assignment of Error – Whether Appellate Counsel Rendered Ineffective Assistance of Counsel

{¶ 14} App.R. 26 provides that "[a]n application for reopening shall be granted if there is a genuine issue as to whether the applicant was deprived of the effective assistance of counsel on appeal." App.R. 26(B)(5). We found such genuine issues and therefore granted the application.[1] *Decker II* at ¶ 14-25. However, the rule further instructs us in

---

[1] The State at this juncture attempts to raise questions about whether reopening should have been granted in *Decker II* based on the arguments that App.R. 26 is an unconstitutional extension of our jurisdiction and, by its own terms, applies only to criminal cases involving convictions and sentences. (May 29, 2018 State's Brief at 16-19.) The State failed to raise these arguments in contesting Decker's application for reopening. (Oct. 12, 2017 State's Memo. in Opp. in passim.) We therefore consider such issues to have been forfeited. But we note that this case was a criminal case and the final appealable result (though not denominated a "conviction and sentence") was nonetheless an order requiring Decker to serve essentially a lifetime term of involuntary

how to proceed in the reopened appeal after granting the application. Specifically, it provides:

> (7) If the application is granted, the case shall proceed as on an initial appeal in accordance with these rules except that the court may limit its review to those assignments of error and arguments not previously considered. * * * The parties shall address in their briefs the claim that representation by prior appellate counsel was deficient and that the applicant was prejudiced by that deficiency.
>
> * * *
>
> (9) If the court finds that the performance of appellate counsel was deficient and the applicant was prejudiced by that deficiency, the court shall vacate its prior judgment and enter the appropriate judgment. If the court does not so find, the court shall issue an order confirming its prior judgment.

App.R. 26(B)(7) and (9). We are therefore also required by App.R. 26(B)(5) to address whether Decker's appellate counsel was ineffective.

{¶ 15} In the initial appeal of this case, appellate counsel not only did not raise trial counsel's inefficacy, appellate counsel stated, during oral argument, "the 'whether he did it part' is done and over with and I'm not disputing that." (Apr. 26, 2017 Oral Argument at 9:26:31-9:26:37; Jan. 11, 2017 Decker's Brief in passim.) In other words, appellate counsel, far from decrying trial counsel's failure to vigorously defend Decker, essentially embraced that mistake by directly conceding the issue of Decker's guilt and failing to raise assignments of error bearing on that issue. Under the circumstances, where there were significant unchallenged reliability questions affecting all the evidence against Decker, and where the record makes clear that trial counsel did little to contest whether Decker committed the offense, we cannot view appellate counsel's concession as a valid strategic choice. *Strickland*, 466 U.S. at 687, 689. Because we have now found that trial counsel was ineffective, it also is now clear that the outcome of the first appeal was altered by appellate counsel's failure to argue the issue of trial counsel's deficient representation. *Id.* at 687, 694.

---

confinement. App.R. 26(b)(1). Moreover, the Supreme Court of Ohio has held that we retain jurisdiction, even after a decision has issued in a direct appeal, to entertain collateral attacks, such as an application for reopening. *State v. Davis*, 119 Ohio St.3d 422, 2008-Ohio-4608, ¶ 20-22; *Morgan v. Eads*, 104 Ohio St.3d 142, 2004-Ohio-6110, ¶ 14-15, 25.

{¶ 16} We sustain Decker's third assignment of error and vacate our decision on Decker's first appeal. App.R. 26(B)(9).

## D. First Assignment of Error – Moot

{¶ 17} Having determined that reversal and remand for a new hearing is warranted, the question of whether the evidence before the trial court constituted clear and convincing proof of Decker's guilt is moot.

## IV.  CONCLUSION

{¶ 18} We find that trial counsel was ineffective in failing to adequately contest the question of Decker's guilt for the underlying offense.  Appellate counsel was also ineffective because he failed to raise that issue on appeal.  We sustain Decker's second and third assignments of error.  Decker's first assignment of error is moot.  Therefore, we vacate our prior appellate decision, reverse the decision of the Franklin County Court of Common Pleas, and remand the matter for a new hearing.

*Prior appellate decision vacated;*
*judgment reversed and remanded.*

KLATT, J., concurs.
DORRIAN, J., dissents.

DORRIAN, J., dissenting.

{¶ 19} I respectfully dissent.  I would modify and affirm the trial court's September 21, 2016 judgment entry.

{¶ 20} This is a very difficult case involving a child victim, H.W., under the age of ten and an adult male, defendant-appellant, who the court determined to be "mildly intellectually disabled" and, as a result, not competent to stand trial and not restorable to competency.  I appreciate the majority's thoughtful reconsideration.

## I. SECOND ASSIGNMENT OF ERROR: WHETHER TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL

{¶ 21} I dissent from the majority's sustaining of the second assignment of error because I do not believe trial counsel provided ineffective assistance of counsel.  Below I address each of the reasons the majority found that trial counsel provided ineffective assistance of counsel.[2]

---

[2] Although in its decision, the majority did not find ineffective assistance of trial counsel on these grounds, at paragraph 4, the majority referred back to its observation in *Decker I* that appellant's confession was

{¶ 22} First, the majority found appellant's counsel rendered ineffective assistance of counsel because she provided "neither evidence nor witnesses in [appellant's] defense." (Majority opinion at ¶ 10.)  On May 26, June 28, and July 14, 2016, the trial court held hearings regarding whether to retain jurisdiction over appellant pursuant to R.C. 2945.39(A)(2).[3]  Prior to those hearings, on July 30, 2014, the court conducted a hearing regarding whether appellant was competent to stand trial.  At that hearing, the state presented and moved to admit into evidence the report of Clinical Psychologist Aracelis

---

"corroborated only by the unsworn out of court statement of the child victim, as relayed through the hearsay testimony of a detective, without consideration of whether a hearsay exception enhanced the statement's reliability to the point of admissibility or whether the child victim (who was under ten years of age) was competent to testify under Evid.R. 601(A)." *State v. Decker*, 10th Dist. No. 16AP-684, 2017-Ohio-4266, ¶ 4. Here, I note the Supreme Court of Ohio's holdings in *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 46, and *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 2, and the exception to hearsay at Evid.R. 803(4). Much of Detective Schluer's testimony addressed statements made by H.W., which I would determine were made for the purpose of medical diagnosis and treatment. Therefore, pursuant to *Muttart* and *Arnold*, the statements were admissible and it was not necessary that the court conduct competency examinations of H.W., pursuant to Evid.R. 601, or consider the factors in Evid.R. 807 as suggested by the majority. To the extent the testimony addressed other statements made by H.W. which were forensic in nature, taking all other evidence into consideration, I would find no prejudice resulted from the same.

[3] The majority opinion states that the trial court's decision to commit appellant "would result in lifelong confinement" and that a "lifetime of confinement was at stake." (Majority opinion at ¶ 11-12.) However, the text of R.C. 2945.39(D) states:

> (1) If the court conducts a hearing as described in division (A)(2) of this section and if the court makes the findings described in divisions (A)(2)(a) and (b) of this section by clear and convincing evidence, the court shall commit the defendant, if determined to require mental health treatment, either to the department of mental health and addiction services for treatment at a hospital, facility, or agency as determined clinically appropriate by the department of mental health and addiction services or to another medical or psychiatric facility, as appropriate. Prior to placing the defendant, the department of mental health and addiction services shall obtain court approval for that placement. If the court conducts such a hearing and if it makes those findings by clear and convincing evidence, the court shall commit the defendant, *if determined to require treatment for an intellectual disability, to a facility operated by the department of developmental disabilities, or another facility, as appropriate*. In determining the place of commitment, the court shall consider the extent to which the person is a danger to the person and to others, the need for security, and the type of crime involved and shall order *the least restrictive alternative* available that is consistent with public safety and the welfare of the defendant. In weighing these factors, the court shall give preference to protecting public safety.
>
> * * *
>
> (3) If a court makes a commitment under division (D)(1) of this section, all further proceedings shall be in accordance with sections 2945.401 and 2945.402 of the Revised Code.

(Emphasis added.)

Rivera, Psy.D., stating that appellant was not competent to stand trial. In that report, Dr. Rivera noted appellant "had difficulty generalizing information into his current legal situation and was *prone to acquiescing*" and "[appellant] would be *unduly vulnerable to influence* during cross-examination." (Emphasis added.) (July 8, 2014 Dr. Rivera Report at 16.) Appellant's counsel stipulated to the findings in Dr. Rivera's report.

{¶ 23} Almost two years later, on March 18, 2016, at a hearing regarding whether appellant had been restored to competency, appellant's counsel moved to admit the report of Psychologist Naeem Khan, Ph.D., and presented Dr. Khan for direct examination. In the report, Dr. Khan echoed much of what the state's expert, Dr. Rivera, stated in her report regarding competency, noting in particular Dr. Rivera's caution that "[appellant] would be *unduly vulnerable to influence* during cross examination." (Emphasis added.) (Dr. Khan's Report at 17.) Appellant's attorney presented Dr. Khan as a witness, direct examined, and redirect examined Dr. Khan. On redirect examination, appellant's attorney specifically questioned Dr. Khan regarding appellant being prone to "acquiescing":

> BY MS. MURRAY:
>
> Q. Talking about acquiescing as being a personality trait or lack of understanding, there is a difference between the two, isn't there, acquiescing to somebody else's wishes as a function of perhaps being weak willed, and then acquiescing to somebody else's wishes because you don't understand how to make the decision yourself, is that a fair statement?
>
> A. It is. It is a fair statement, and also by their own characteristic, people with intellectual disability try to please, try to please, because they want to fit in. They don't want to disagree with you, because they cannot relate to challenges.
>
> Subjecting an individual like him to a cross-examination, that is a nightmare, because he acquiesces to what you say, and he will acquiesce to what you say. And ultimately, you can convince him that he could plead guilty to even a more heinous crime, and he would.

(Tr. at 139-40.)

{¶ 24} At the same hearing, the state moved to admit the report of Clinical Psychologist Joseph E. Kovesdi, PhD., to support its argument that appellant had been restored to competency. Dr. Kovesdi stated in his report: "While [appellant] is able to follow along in a conversation and engage in simple logic, it is important that the speaker

be aware of his deficiencies.   While functional, his abilities are in the lower end of the percentile ranking in the population.   It may be necessary to speak in a simpler manner, present information a little more slowly, and give him time to process information before moving on."  (Mar. 16, 2016 Dr. Kovesdi Report at 3.)  Appellant's counsel cross-examined Dr. Kovesdi at the hearing and, in particular, asked him about the opinions of Drs. Rivera and Khan that appellant was "prone to acquiescing to others."  (Tr. at 83.)  Dr. Kovesdi agreed with that assessment:

> Q. Okay. And was prone to acquiescing to others?
>
> A. Yes, he is. And that one, I didn't really see much of those reports prior, but the acquiescing is a personality trait. It is not really a cognitive capacity. I could be of normal intelligence, very smart, and have a tendency to acquiesce; and if I acquiesced, that could - - I could easily, because I want to acquiesce, become confused.
>
> But I don't think we are going to use a personality trait such as acquiescing to determine competence. If we did, that would be a new area to me, let's give personality testing to see * * * if they are competent to stand trial. If they have certain personality traits, then they should not be competent to stand trial. To me, that is not a cognitive capacity. That is a personality trait.
>
> Q. Isn't it a personality trait that is common to people who have mild mental retardation?
>
> A. I would say it is associated, yes. It is not a defining trait, but it is more common, sure.
>
> Q. And would that, would being prone to acquiescing, would that be caused by somebody's inability to understand information and process information?
>
> A. It probably plays a role. Not everybody with mild mental retardation acquiesces. We probably have a larger percentage of people with mild mental retardation that acquiesce than everybody else, but again, I didn't see acquiescing as a cognitive capacity or any kind of trait that I have ever seen that should be considered in one's ability to perform. I guess if I did, I would start giving personality tests and say, oh, I don't care what his intelligence is, but he acquiesces, so we better not find him competent.
>
> * * *

Q. And I appreciate you not only with the positives in your report expressing that there are still some problem areas for [appellant]. Wouldn't you agree that showing willingness to defer to his attorney is kind of the same as acquiescing to what somebody else wants?

A. I don't know about that. I mean, I would defer to my attorney on certain things. I would really want to defer to my attorney, because I don't understand all the positives and negatives of that. I would really want to know what is your advice to me? I mean, that is what you are familiar with this. I think he would do that. I think he would listen to what you have to * * * say. He has got ability to make judgments and to think things through.

He does have a tendency to acquiesce. I don't think that is a determining factor. And if we are trying to talk him into doing something that was totally wrong, I don't think he would acquiesce in that situation when all of his judgment is against it.

Q. I guess I will point out the second part of that sentence. If he lacks comprehension of an issue - - for example, I could give him advice on whether to take a plea bargain or whether to go to trial.

A. Okay.

Q. But if he doesn't completely understand everything that is going on, what you are saying is that he would do what I tell him to do?

A. Yes. He probably would. He would do what you tell him, but would he understand? That is the key. To me, those - -

Q. If he didn't understand - -

A. If he didn't understand, he would cooperate. But I think - -

Q. He would do what I told him to do?

A. And I probably would too.

(Tr. at 83-87.)

{¶ 25} On May 26, 2016, the court began hearings to determine whether the criteria of R.C. 2945.39(A)(2) had been met. The court continued those hearings on June 28, and

July 14, 2016. At these hearings, the state was required to present clear and convincing evidence that: (1) the defendant committed the offense with which defendant is charged, and (2) the defendant is a mentally ill person subject to court order or a person with an intellectual disability subject to institutionalization by court order. This appeal addresses, in particular, the trial court's determination that the state presented clear and convincing evidence that appellant committed the offenses with which he was charged—rape and gross sexual imposition. In particular, appellant takes issue with the evidence presented by the state to support the determination that he committed these offenses: (1) Franklin County Sheriff's Office Detective Joe Schluer's testimony summarizing the responses of H.W. during the child advocacy center ("CAC") interview, and (2) video evidence of the police interrogation of appellant and Detective Schluer's testimony regarding the same. I will discuss the majority's concern with the evidence in more detail below. However, taking into consideration appellant's counsel's presentation of Dr. Khan's report, stipulation to Dr. Rivera's report, and examination of the experts, including Dr. Kovesdi, I would not find appellant's counsel was ineffective on the grounds stated by the majority, that she provided neither evidence nor witnesses in appellant's defense.

{¶ 26} Second, I will address the majority's second and third concerns together. The majority found appellant's counsel rendered ineffective assistance of counsel because: (1) counsel did not object to the admission into evidence of the video of the police interrogation of appellant, and (2) counsel did not present any authority to support the argument that police interrogation tactics as used here "pose a significant danger of eliciting false confessions from mentally disabled suspects." (Majority opinion at ¶ 10.) I find this to be the most challenging of appellant's arguments because I share the majority's concern that all counsel should take special care to effectively examine and question the voluntariness and reliability of any confession by a defendant who has an intellectual disability and that courts should take special care in considering the same. Nevertheless, considering the totality of the circumstances in this case, I would not find trial counsel was ineffective in this regard.

{¶ 27} Here, I am mindful of several things. First, the video confession was shown to a trial judge in the context of an R.C. 2945.39 hearing,[4] not to a jury in the context of a

---

[4] *See* discussion at ¶ 28 herein.

trial. Second, appellant states at one point in his brief that his confession was involuntary; however, he does not argue police coerced him, rather his argument goes more to the reliability[5] and weight[6] of his confession.[7] Third, as noted above, the trial judge was aware of the expert witnesses' concerns regarding appellant's vulnerability to influence and his being prone to acquiesce and could consider such evidence when weighing and considering the video confession and testimony of Detective Schluer regarding the same.

{¶ 28} On June 28, 2016, the state presented Detective Schluer. Detective Schluer testified regarding his interrogation of appellant and appellant's confession during the same interrogation. During direct examination, appellant's counsel objected to the detective's responses regarding the voice stress test which the detective administered to appellant. The court permitted testimony that a voice stress test was administered but struck from the record testimony regarding the results of the test. As noted by the majority, appellant's counsel did not, however, object to the state introducing and playing state's exhibit A, a portion of the interview Detective Schluer conducted with appellant–the last 21 minutes when appellant's girlfriend talked to appellant and detectives followed up with appellant after he confessed with his girlfriend present.

{¶ 29} Nevertheless, appellant's counsel extensively cross-examined Detective Schluer regarding his interview of appellant. Counsel asked questions regarding whether the detective was aware appellant was developmentally disabled or slow. Counsel asked numerous questions regarding Detective Schluer's and his colleague, Detective Jackson's, interrogation strategy and tactics. Counsel asked questions such as:

> Q. So at some point she [sic] even told him he was lying?
>
> * * *
>
> Q. * * * Detective Jackson was saying, well, maybe this was all an accident. Is that a technique that is used[?]
>
> * * *

---

[5] "The circumstances of [appellant's] confession cast serious doubt on its reliability." (Appellant's Brief at 23.)
[6] "And under these circumstances, [appellant's] confession was not clear and convincing evidence." (Appellant's Brief at 24.)
[7] Nowhere in appellant's brief or reply brief does appellant suggest the trial court or this court should conduct an analysis of whether the confession was voluntary. Nor does appellant point to any caselaw regarding the factors which a court should consider to determine the voluntariness of a confession of an adult defendant who has been determined to be mildly intellectually disabled. Appellant does not address this in his briefs.

Q. * * * [One] of you said * * * is maybe she came on to you.

* * *

Q. How about saying something to the effect, are you a good guy who just made a mistake, or somebody who likes to hurt children?

(Tr. at 212-14.)  Appellant's counsel continued:

Q. And that - - correct me if I am wrong - - that was kind of a theme throughout the interview, wasn't it? Are you a good guy who made a mistake, or are you a bad guy who likes to molest children?

A. I mean, you are going back to how you are interviewing somebody and how it goes forward, so, yes, we asked them questions.

Q. Now, do you believe that? Do you believe there is a difference between a good guy that makes a mistake or a serial child molester?

A. To a certain degree.

Q. Did you believe that about [appellant], or was that an interview technique?

A. I would probably say that is an interview technique on that.

(Tr. at 219.)  Appellant's counsel further asked:

Q. You said you don't normally have outsiders come in and participate in the interview. That is when we were talking about having [appellant's girlfriend] come in, right?

A. Yes, ma'am.

Q. Why is it that you brought her in on this interview?

A. I think he was wanting to talk to her, and also she wanted to see him. So we weren't going any further - - we weren't getting anywhere with the interview the way we were talking. So we decided to bring her on in.

Q. Okay. Now, she encouraged him to tell you guys that he did it, right?

A. Yes.

> Q. And that is when he confessed?
>
> A. Yes.

(Tr. at 214-15.)   Counsel asked additional questions about positive reinforcement the detectives gave appellant when he confessed:

> Q. Now, after [appellant's girlfriend] came in and [appellant] said that he had done it, if you recall watching the last 20 minutes of the interview, Detective Jackson kind of went over to [appellant] and kind of patted him on the shoulder and said, all right, now you are doing the right think, now you are the good guy now, right?  Do you recall that?
>
> A. Yes. I saw him.
>
> Q. [Appellant] got some positive reinforcement?
>
> A. Yes.
>
> Q. For telling you what you wanted to hear?
>
> A. Yes.
>
> Q. Nobody was patting him on the back when he was denying the offense, correct?
>
> A. Correct.
>
> Q. And then you have [appellant's girlfriend] leave, and you start talking to [appellant] again about what exactly happened?
>
> A. Yes.

(Tr. at 216.)  Appellant's counsel also inquired whether Detective Schluer thought appellant knew what the word "labia" meant.  (Tr. at 217.)

{¶ 30} In closing, appellant's counsel referred back to Dr. Khan's assessment that appellant was susceptible to acquiescence:

> Further, according to Dr. Khan, [appellant] is susceptible to, for lack of a better word, being manipulated by others. He is a people pleaser. That is the nature of somebody with his developmental disability.
>
> The detective's testimony was that they went through a significant portion of the interview of [appellant] where he

continuously denied that he had done these things. They tried different techniques with him that they went over, they called him a liar, and finally, in the last 20 minutes of what was over a two-hour interview, they bring his girlfriend in to secure a confession from him.

As we pointed out in cross-examination, there was approximately two hours of negative reinforcement by the detectives. When [appellant] finally told them what they wanted to hear, there was positive reinforcement by Detective Jackson. He even did so much as shake [appellant's] hand and patted him on the shoulder, said he was doing a good job, didn't he feel better?

They went on to question him some more even after that positive reinforcement. As soon as [appellant] gave them an answer they didn't want to hear, which was a denial of touching [H.W.] on her vagina or in her folds, it was, come on, [appellant]. Negative reinforcement to somebody like [appellant]. Then he eventually did confess, did indicate with his hands what the detectives wanted him to indicate.

So I would ask the court to give that consideration in determining how much weight you are going to give to what [appellant] said, and I would submit to the court that it should be given very little weight in comparison to the other evidence that the state presented.

In addition to the state putting evidence on the record to try to prove by clear and convincing evidence that [appellant] committed the offense, I would submit they have not met that burden with the charge of rape. Perhaps with gross sexual imposition, but not rape.

(Tr. at 234-35.)

{¶ 31} Taking all this into consideration, in particular appellant's counsel's cross-examination of Detective Schluer and closing argument, as well as my review of state's exhibit A,[8] I would not find appellant's counsel was ineffective on the grounds stated by the majority that: (1) counsel did not object to the admission into evidence of the video of the police interrogation of appellant, and (2) counsel did not present any authority to support

---

[8] During the police interrogation, after his confession, appellant expressed concern over and over again about his fear of going to prison, and that: (1) H.W.'s family members would kill him, (2) he would get beat up in prison, (3) no one would take care of his mother, (4) his girlfriend might not stay with him, and (5) he would not receive his medications or medical treatment in prison.

the argument that police interrogation tactics as used here "pose a significant danger of eliciting false confessions from mentally disabled suspects." (Majority opinion at ¶ 10.)

{¶ 32} Third, the majority found appellant's counsel rendered ineffective assistance of counsel because counsel, in closing, conceded that the state "had '[p]erhaps' met its burden 'with gross sexual imposition, but not rape.' " (Majority opinion at ¶ 11, quoting Tr. at 235.) I have previously discussed appellant's counsel's cross-examination of Detective Schluer regarding appellant's interrogation and H.W.'s interview. It is clear to me from this cross-examination that appellant's counsel was, in particular, attempting to discredit the state's evidence regarding the charge of rape. Appellant's counsel continued this effort in closing argument by emphasizing that according to Detective Schluer, nowhere during the CAC interview did H.W. state appellant touched her vagina or went inside of her labia. Counsel then argued the court should give "very little weight" to appellant's confession regarding the same given the tactics used by police interviewers. (Tr. at 235.) As noted above, counsel summarized her argument regarding whether appellant committed the offenses with which he was charged by stating: "In addition to the state putting evidence on the record to try to prove by clear and convincing evidence that [appellant] committed the offense, I would submit they have not met that burden with the charge of rape. Perhaps with gross sexual imposition, but not rape." (Tr. at 235.)

{¶ 33} I do not believe that counsel's particular focus on discrediting the evidence pertaining to rape was ineffective. To the contrary, as I discuss further below, I would find it to be effective and sound strategy. I would not find appellant's counsel rendered ineffective assistance of counsel on these grounds.

{¶ 34} Finally, the majority finds appellant's counsel rendered ineffective assistance of counsel because in closing she "appeared to concede [appellant's] guilt by arguing that no evidence was presented that [appellant] had 'done this more than once or that [appellant] ha[d] expressed any ideation that he [was] going to do this again.' " (Majority opinion at ¶ 11, quoting Tr. at 237.)

{¶ 35} This statement was made in the context of appellant's counsel addressing whether appellant is a danger to himself or others in the community and whether he should be institutionalized—not in the context of whether he had committed the offense.

Therefore, I would not find appellant's counsel rendered ineffective assistance of counsel on these grounds and in this context.

## II. THIRD ASSIGNMENT OF ERROR: WHETHER APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL

{¶ 36} I would also dissent from the majority's sustaining of the third assignment of error. Because I would not find appellant's trial counsel was ineffective, I would not find that appellant's appellate counsel was ineffective for failing to raise the same on direct appeal.

## III. FIRST ASSIGNMENT OF ERROR: WHETHER CLEAR AND CONVINCING EVIDENCE SUPPORTED THE TRIAL COURT'S FINDING THAT APPELLANT COMMITTED THE OFFENSES WITH WHICH HE WAS CHARGED

{¶ 37} The majority determines to be moot the first assignment of error. However, because I would overrule the second and third assignments of error, I believe it is necessary to consider the first assignment of error. As noted previously, R.C. 2945.39(A)(2) required the court to find by clear and convincing evidence the defendant committed the offenses with which he was charged. In *State v. Decker*, 10th Dist. No. 16AP-684, 2017-Ohio-4266, we stated that "[c]lear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established. * * * It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *Id.* at ¶ 18, citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of syllabus.

{¶ 38} Before considering whether the state met the burden of clear and convincing evidence that appellant committed the offenses with which he is charged, I think it is important to remember the purpose and context of such a finding pursuant to R.C. 2945.39. In *State v. Williams*, 126 Ohio St.3d 65, 2010-Ohio-2453, the Supreme Court explained that "[t]he clear-and-convincing-evidence standard of R.C. 2945.39(A)(2) for determining whether the defendant committed the crime charged does not violate the defendant's due-process rights. Instead, a trial court's finding under this evidentiary standard that the defendant has committed the offense charged *is used only to determine the defendant's degree of dangerousness.*" (Emphasis added.) *Id.* at ¶ 60. In *Williams*, the court further explained: "R.C. 2945.39 is a civil statute with a primary goal of protecting the public. It is of great significance to our due-process inquiry that R.C. 2945.39(D)(1) requires the court

to order the least-restrictive commitment alternative available consistent with public safety and the defendant's welfare, while also emphasizing that the court 'shall give preference to protecting public safety.' " *Id.* at ¶ 58. Finally, the court cautioned that "[a] trial court's determination by clear and convincing evidence under R.C. 2945.39(A)(2) that the defendant committed the offense does not require a finding of scienter and *is merely a factor considered in determining the propriety of the commitment; it plays no role beyond that limited purpose.*" (Emphasis added.) *Id.* at ¶ 33. I examine the first assignment of error with the Supreme Court's statements in *Williams* in mind.

{¶ 39} Appellant was charged with rape in violation of R.C. 2907.02, a felony of the first degree. The indictment alleged that appellant "did engage in sexual conduct, to wit: digital vaginal penetration, with H.W., * * * being less than thirteen (13) years of age, to wit: nine (9) years of age, and the said H.W. being less than [ten] (10) years of age, to wit: nine (9) years of age." (Indictment at Count 1.) The relevant portion of R.C. 2907.02 states:

> (A)(1) No person shall engage in *sexual conduct* with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
>
> * * *
>
> (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.
>
> * * *
>
> (B) Whoever violates this section is guilty of rape, a felony of the first degree. * * * [I]f the victim under division (A)(1)(b) of this section is less than ten years of age, in lieu of sentencing the offender to a prison term or term of life imprisonment pursuant to section 2971.03 of the Revised Code, the court may impose upon the offender a term of life without parole.

(Emphasis added.)

{¶ 40} "Sexual conduct" means "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

{¶ 41} In *State v. D.H.*, 10th Dist. No. 16AP-501, 2018-Ohio-559, this court extensively discussed the definition of "into the vaginal or anal *opening* of another" in the context of R.C. 2907.01(A) as applied to offenses committed after August 3, 2006. (Emphasis added.) *See id.* at ¶ 30-40 and 54-57.

{¶ 42} On direct examination, Detective Schluer testified appellant made an admission that he did in fact put his fingers between H.W.'s labia. However, as noted above, in her cross-examination of Detective Schluer regarding H.W.'s responses to the CAC interviewer questions, appellant's counsel asked many questions regarding whether H.W. stated that appellant engaged in conduct which would meet the definition of "sexual conduct":

> Q. So as specifically as [H.W.] got, she said [appellant] touched her private area?
> A. Yes.
>
> Q. And she didn't say it hurt, correct?
>
> A. I am sorry.
>
> Q. She didn't say it hurt?
>
> A. Not that I can recall.
>
> Q. She didn't say his finger went inside of her, correct?
>
> A. I don't recall that. Not that I can recall, no.
>
> Q. She didn't say that he made her spread her legs?
>
> A. No.

(Tr. at 207.)

{¶ 43} Appellant's counsel also asked Detective Schluer numerous questions regarding whether appellant stated he engaged in conduct which would meet the definition of "sexual conduct":

> Q. And then you have [appellant's girlfriend] leave, and you start talking to [appellant] again about what exactly happened?
>
> A. Yes.
>
> Q. And he continues to deny that he put his finger inside [H.W.] I think you asked specifically her vagina. He said no, correct?

A. Correct.

Q. And then you had asked him specifically about the folds, correct?

A. Yeah. I don't remember how it was worded. That is close enough.

Q. I think you said labia first, right?

A. Okay.

Q. Do you think [appellant] knew what the word labia meant?

A. Probably not.

Q. You didn't explain it to him, right?

A. I think we ended up saying - - I don't recall how we worded that.

Q. Okay. Regardless of how you worded it, he said, no, I didn't, right?

A. Originally he did.

Q. Yes. That is correct. And then Detective Jackson - - and I think you too, it is hard to tell - - said something like, come on, [appellant]. Do you recall seeing [sic] that?

A. Yes.

Q. So that would be negative, a negative reaction to that [sic] he was saying. Is that a fair statement?

(Tr. at 216-18.)

{¶ 44} Taking into consideration this court's discussion regarding the definition of "sexual conduct" in *D.H.*, Detective Schluer's testimony and appellant's limited statement and demonstration depicted in state's exhibit A regarding putting his fingers between H.W.'s labia, I am not convinced the evidence presented by the state rises to the level of clear and convincing evidence of rape. Accordingly, I would sustain the first assignment of error as to rape.

{¶ 45} However, I would overrule the first assignment of error as to gross sexual imposition. Appellant was charged with three counts of gross sexual imposition, in violation of R.C. 2907.05, felonies of the third degree. The indictment alleged appellant "did have sexual contact with H.W., * * * the said H.W. being less than thirteen (13) years of age, to wit: nine (9) years of age." (Indictment at Counts 2 through 4.) The relevant portion of R.C. 2907.05 states:

> (A) No person shall have *sexual contact* with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>
> * * *
>
> (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.
>
> * * *
>
> (B) No person shall knowingly touch the genitalia of another, when the touching is not through clothing, the other person is less than twelve years of age, whether or not the offender knows the age of that person, and the touching is done with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.
>
> * * *
>
> (C)(2) Gross sexual imposition committed in violation of division (A)(4) or (B) of this section is a felony of the third degree.

(Emphasis added.)

{¶ 46} "Sexual contact" means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 47} Considering the evidence before the trial court in the form of state's exhibit A, Detective Schluer's testimony regarding appellant's interrogation, and his testimony regarding H.W.'s responses to CAC interview questions and description regarding

appellant's conduct, I would find the state did present clear and convincing evidence that appellant committed gross sexual imposition.

## IV.  CONCLUSION

{¶ 48} Therefore, for the reasons outlined above, I respectfully dissent from the majority's sustaining of the second and third assignments of error and vacating our prior appellate decision and reversing the decision of the trial court.  I would address the first assignment of error, and sustain the same only as to the rape charge, but overrule the same as to the gross sexual imposition charges.  Accordingly, I would reverse and vacate only that portion of the trial court's September 21, 2016 judgment which finds by clear and convincing evidence that appellant committed the offense of rape.  I would modify the judgment accordingly and affirm all other findings of the trial court, including the finding by clear and convincing evidence that appellant committed the offenses of gross sexual imposition.  On these grounds, therefore, I would affirm the trial court's order that:

> The Court therefore ORDERS:
>
> 1. the defendant be committed, pursuant to Section 2945.39(D)(1), of the Ohio Revised Code, to: Columbus Developmental Center, 1601 W. Broad Street, Columbus, OH 43222 which the Court finds to be the least restrictive commitment available consistent with public safety and the defendant's welfare,
>
> 2. the Prosecuting Attorney to provide to the above place of commitment all information by Section 2945.39(D)(2) of the Ohio Revised Code,
>
> 3. all further proceedings shall be in accordance with Sections 2945.401 and 2945.402 of the Revised Code.

(Emphasis sic.)  (Sept. 21, 2016 Entry at 2.)

_____